Sylvia Lett, Assistant Federal Public Defender, District of Arizona Appearing on behalf of Appellant Kenneth Jeremy Laird. This matter originally started out as a capital case. However, under Roper v. Simmons, the U.S. Supreme Court found that it was unconstitutional to execute someone who was a juvenile at the time of the offense, and the district court accordingly granted habeas relief to Mr. Laird on that claim. However, the district court denied his other claims and that are the basis of today's appeal. Mr. Laird was resentenced on the first-degree murder charge to 25 years to life with the possibility of parole after the first 25 years, and all of the rest of his offenses were found to be aggravated and to run consecutively after his first-degree murder charge, actually except for two forgery counts that were to run concurrent. This appeal requests reversal of the district court's denial of habeas relief on four certified issues. In particular, there's a misjoinder issue that I'd like to talk about today, and also Mr. Laird's claim that his trial counsel was ineffective in failing to develop guilt phase information in investigation. Relief is requested because the trial counsel's ineffectiveness, coupled with different errors at trial, actually prejudiced Mr. Laird to such a degree that his right to a fair trial was violated. Trial counsel conducted virtually no guilt phase investigation and failed to meet with Mr. Laird to develop a defense, and as a result, the State's case against Mr. Laird was really never put to the test, if you will. I'd like to ask you a question about the misjoinder, which you said was one of the issues you wanted to address today. What is the prejudice that was suffered by the misjoinder? It seems to me that the misjoined count was a very small tail on a very large dog because it dealt with stealing a baseball cap, and it seemed to me unrealistic to other extremely serious issues as to which there was extensive evidence of your client's guilt. So why was the State court unreasonable in determining that there was no prejudice, assuming that the issue was preserved? It is our contention that the issue was properly preserved, and the prejudice to Mr. Laird actually went both ways. As a side matter, the prejudice of the murder charges onto the robbery resulted in a juvenile who stole a baseball cap receiving an aggravated five-year term. So there's prejudice going both ways. But the prejudice on the capital accounts was that the court unreasonably applied the U.S. v. Lane decision in determining that they focused only on the overwhelming evidence of the client's guilt. As a side issue, part of their analysis in determining whether there was overwhelming evidence was that the Arizona Supreme Court, in its direct appeal decision, stated that there was blood found in Mr. Laird's house on his blinds that matched that of the victim. That was absolutely erroneous information. And that's true, but excising that, wouldn't the result have had to be the same? Your Honor, I believe that it's difficult to excise that because we don't know what was the actual tipping point in terms of looking at the overwhelming evidence, meaning that we actually don't know what to do. How do I put it? To me, blood on the blinds and the language that the court used, they said match, which immediately brings to mind that there was somehow a DNA match or something. That sounds like such scientific evidence that that might have been the evidence that the court used to say, yes, this is what made it overwhelming evidence. The evidence against Mr. Laird, all of the evidence matched Mr. Laird's story. His fingerprints were found on soda cans, some liquor in the house. His fingerprints were found inside the truck that he was found driving. His fingerprints were never found on the murder weapons. And there was actually a latent fingerprint found on the doorknob that was reversed in the house that did not match Mr. Laird. So it's our contention that – But you're leaving out all the evidence on the other side in your recitation, including his – starting with his statement that he killed to get a truck and ending with his taking the police to the body and having a lot of blood in between that was found in the truck and a lot of other gory evidence that was there. So why isn't that what we should be focusing on for this purpose in determining whether the State court was unreasonable? Well, I would submit that under U.S. v. Lane, the decision contemplates more than just focusing on the one factor, was there overwhelming evidence of the guilt. The decision also focuses on the cross-admissibility of the evidence in other trials, which here it would not be cross-admissible. It also focuses on whether or not a proper limiting instruction has been given. And in this case, there was absolutely no direction given to the jury to consider the two counts separately. And further, in the State's closing, they encouraged the jury to consider the robbery of the baseball cap as, quote-unquote, indicative of the viciousness of the defendant as to how vicious he was inside the house. Also, the Lane decision states that you should look to see whether or not the two counts are simple, distinct, and easily compartmentalized. With the State's counsel didn't the Arizona superior court instruct the jury that they were to give separate consideration to each of the counts? No, Your Honor, they didn't. When the State's brief cites to that, they miss-cite and they're actually citing to a separate trial for separate charges for which Mr. Laird was convicted that are not before this Court. So the transcript of the jury instructions at 136 where the Court said, now again, there are seven counts against Mr. Laird, you should consider the crime separately as from a different trial? I would have to go back and check, but yes. Counsel, the Arizona supreme court found that the Petitioner had procedurally defaulted his severance count claim on the robbery, that he failed to renew the motion during trial and waived the issue. Now, why doesn't that end it? Why isn't that procedurally defaulted? Your Honor, the analysis continues because the State went on to the State court went on to consider the merits of the claim. At oral argument, the States actually conceded that the mis-conceded that the mis-joinder was improper, and also the Arizona supreme court's fundamental error. What difference does that make? If it's defaulted, it's defaulted. And why should we address it? Because the Arizona supreme court's fundamental review actually, in certain circumstances, excuses procedural default. And this type of error is the type of error that it covers. Hasn't this Court held repeatedly that fundamental error review is not the same as reaching the merits, that it doesn't excuse a procedural default in Arizona, in Poland v. Stewart and other cases? It has, Your Honor, but I would point the Court to the Huffman v. Ricketts decision out of the Ninth Circuit, discussing that that fundamental error is error that goes to the foundation of the case, and such a magnitude that the defendant was denied a fair trial, and this is what we believe happened in this case. So we're back to the prejudice question that you started on. Yes. This is a circular case. Your Honor, I'd like to take a few moments to talk about the ineffective assistance of counsel claim. I know that your next question will probably be again, what is the evidence of prejudice? And what happened at the State post-conviction level is that Laird requested an evidentiary hearing. The State claims that he failed to comply with the rules in terms of putting in affidavits, records, and other evidence to support his claims of prejudice. The records that he did put in were a copy of jail records and portions of trial transcripts that show that the trial counsel really had never met with the client, had never established any type of relationship that's contemplated by the ABA Guidelines in capital cases, and really had spent an insufficient amount of time with him. Our showing of prejudice in Federal court is a bit constrained by the Arizona district court's allowance for our development of that type of evidence. In Arizona, routinely, we are denied the right to subpoena power. We're also denied pre-petition discovery. So again, it's a circular issue that until we get an evidentiary hearing, we don't actually we're not actually able to go back in and do the discovery necessary to prove the prejudice. Well, it doesn't prevent you from sending out investigators to talk to witnesses and putting affidavits in as part of your petition, does it? No, Your Honor, it doesn't. It also is an interesting thing, although this started as a capital case, as you point out, as it reaches us, it no longer is a capital case. So if there are different rules that should apply or different levels of scrutiny that should apply to the ineffective assistance claim, at this point, do we look at the ones pertaining to a capital case or a non-capital case? Your Honor, I believe that you should look at the rules pertaining to a capital case, because that was the procedural posture, for lack of a better term, that it was in at the time that trial counsel was failing to meet minimal standards of competence. You know, the jail records indicate that he only met with Mr. Laird two times prior to trial. The first was for 22 minutes, and the second was for 70 minutes. And also, Mr. Laird made a motion for change of counsel at the beginning of the --" I'm sorry, nine months into the case, and he says, quote, unquote, that he needs some time to tell his side of the story. I'm not going to do a life sentence for somebody else. Arguably, that put trial counsel on notice that he was stating that there were other people involved. That error, he withdrew that motion only after assurances from the trial court and counsel that counsel would actually start doing something on his case. Didn't the Arizona Supreme Court, or maybe it was the court of appeals, make reference of the fact that defense counsel had actually precluded witnesses from testifying as a result of the investigation that he had done and motions in limine at the trial? Your Honor, the only thing in the record is reference to a trip to Utah in which trial counsel and his investigator, quote, unquote, went to talk to a purported jailhouse snitch. The whole thing kind of fell apart, and they never moved forward with any of it, and the State never used any of that evidence either. I mean, this is a case where defense counsel did do some things, but everything that he did was basically on the defense to the State's case. The State, at trial, he told the court that he would be presenting some witnesses. The State finished their side of the story, and he stood up and said, Your Honor, we have nothing further. We rest. He had had no type of meaningful discussion with his client about the investigation, trial strategy, or any investigation. Further, the investigator that he had, you know, this is another difficult situation. It's not part of the record. We have an affidavit from the trial investigator. We submitted it as part of our Rule 7 motion to expand the record that was denied by the district court, and the content of that declaration talks about how she still, to this day, doesn't understand why trial counsel did not let her do the typical investigation that she would do as part of the case, other than interviewing this one witness, and that he actually actively told her not to do any investigation on the case. Kagan. Counsel, did you want to reserve some time for rebuttal? Yes, I did. Thank you very much, Your Honor. Thank you. We'll hear from the State. Mr. Anderson. May it please the Court, my name is John Anderson. I'm with the Arizona Attorney General's Office representing the Respondent Dora Schreiro, who is the Director of the Department of Corrections. On the ineffective assistance of counsel issue, the State trial court in the Rule 32 proceeding said there's absolutely been no prejudice shown in this case. Whatever witnesses could have been interviewed, whatever amount of jail visits there have been, whatever alternative defenses could have been explored, there's been no showing whatsoever that that would have changed the result at trial. There just aren't any other defenses to submit. Self-defense wouldn't have worked. The victim was killed. There was a rope. A screwdriver was put through and she was strangled slowly with that. It's not going to be self-defense. Intoxication is only a limited defense. And the defense did obtain an intoxication instruction that it's a defense to intentional crimes. The defense argued that, well, maybe it's second-degree murder, obtained a second-degree murder instruction. The defense was very limited in this case by what Laird had told the police during his interviews. He admitted to all the things. He admitted to stealing her truck. He admitted to being in her house. He admitted to trying to pass her checks. And there's no question about that. He was seen with the truck with various school officials, with some of his friends. His story was just incredible. He said that he didn't get the truck until 6 p.m. on Thursday, but witnesses had seen him with the truck before that, and he claimed that he only went to her house after that. So his story was completely incredible, but defense counsel was stuck with it, and he did the best he could to show that, well, there's no – nobody actually saw the murder. But there's still overwhelming evidence of the murder. He admitted to two friends, I killed a bitch. I hit her over the head with a crowbar. Besides being strangled, she was also hit in the back of the head. There was blunt force trauma. And he admitted to those same two people that I killed a bitch and dumped her body in the desert. Just that – those inculcatory statements by themselves are – But, counsel, if I understood the argument by Ms. Lett, if he didn't do anything, then applying the Supreme Court's cases such as Taylor, where there was very little evidence that the defense lawyer did anything, to go out and try and see if there might be evidence that could be raised proactively in defense as opposed to reactively, that that can constitute an effective assistance of counsel. Well, this is – there's still a prejudice prong to Strickland. There wasn't deficient performance in this case. Just to address that prong, although the state court and the district court denied it on the prejudice prong, but there wasn't deficient performance. He did visit him in prison. The records that the defense submitted – But Taylor – I mean, Justice O'Connor's opinion, Taylor requires more than that, doesn't it? It requires counsel to actually go out and interview some witnesses. He did go out and interview witnesses. The Utah witness that – One witness? A gentleman? More than that. More than that. There's no evidence. There weren't any affidavits from anyone to show that his practice was not to interview witnesses. And the record indicates that it was his practice to interview witnesses. I mean, he went to great lengths to interview this out-of-state Utah witness. He also interviewed the record shows, and it's – may I point out that it's the Petitioner's burden in the Rule 32 proceedings to make a record, but the trial court record shows that he interviewed – besides the Utah witness, it was very crucial, because Laird gave a complete story to him, and he managed to keep that witness out, saying that he was a state agent. So that was very important that he interviewed that witness and kept him out. He also interviewed Randy Leister, who was the state's criminalist. And Leister said, well, I can't – I can't say for an absolute certainty that the blood on the blinds in Laird's home that he broke into to get his stuff was the victim's blood. And he – defense managed to obtain a motion eliminating – ruling on that, keeping that out unless there was more evidence introduced. He also introduced Dion Chavez, another criminalist, when he made an oral argument on that motion. So the record also shows that he interviewed at least two criminals. So the record shows that it was his practice to interview people. He also stated to the jury during his opening statement, which is the first day of trial, he said that we've interviewed all the witnesses, both of us have interviewed the witnesses, we know – we know what this case is, we know what the witnesses are going to say. Also, this Court has said that it's not necessary to interview all witnesses if you know what they're going to say. And in this case, we had a juvenile transfer hearing in which most of the witnesses testified. Attorney Clark actually impeached three of the witnesses – I think Gregory, Drima Einfeld, and one of the witnesses with statements they had made during the juvenile transfer hearing. The defense concedes that the – Greg Clark read all the police reports, so he had plenty of evidence that he needed to – to examine the witnesses. There were some 50 witnesses. If this Court reviews the entire record, we'll see that he was prepared for the witnesses. He knew what they were going to say. If the Court doesn't have any more questions on – on Claim 14, which – oh, I just wanted to raise one more point on that. Claim 14 on the evidentiary hearing issue, the United States Supreme Court in Williams and this Court in Baja v. Ducharme says that it's not enough just to request an evidentiary hearing. You have to do it in the manner required by state law. Arizona law, which is in State v. Bourbon, says that you have to present affidavits to the Court to get an evidentiary hearing. In this case, all the defense introduced was some – some jail records. He could have easily introduced affidavits from the defendant himself, saying, I never met with counsel, or I met with him twice, or whatever, but no such affidavit was introduced. It's easy to present affidavits. You don't have to have an investigator spend a lot of money to go and get these affidavits, but no affidavits were introduced in the Rule 32 hearing, and so he wasn't entitled to an evidentiary hearing in State court, and therefore, he didn't diligently pursue his development of the record, and he's not entitled to one in Federal court. This Court will allow me to go back to the first issue, the Miss Joinder issue. The State Supreme Court said, well, yes, there is an error of State law in the Joinder, but this Court – the Federal courts do not review errors of State law, as the United States Supreme Court said in Estelle v. McGuire. The issue is whether or not the State courts, in rejecting the claim, unreasonably applied, clearly established Federal laws established by the United States Supreme Court. The parties assumed, in this case, that the controlling Supreme Court authority is United States v. Lane. I just have one caveat for that. Lane is a Federal case, so it's not exactly clear that it's setting Supreme Court authority on what the States have to do in State court proceedings, and also in Estelle v. McGuire in footnote 5, the United States Supreme Court said, we're leaving the open the issue of whether the due process – it's a due process violation to introduce propensity evidence at a trial. So it's not clear that that's clearly established Supreme Court authority, and if there's no Supreme Court – clearly established Supreme Court authority under Cain v. Espatia, a recent Supreme Court decision, then the habeas petitioner can't get relief. But assuming that Lane is this controlling authority, the first – Lane basically said – what the Federal courts were doing was they said, if there's misjoinder in a Federal case, it's reversible error, period. There's no harmless error analysis. What the Supreme Court said, well, that can't be right. There's been a lot since the development of Chapman v. California shows that you do have a harmless error analysis, even for constitutional errors, and in Lane it wasn't a constitutional error. It was just an error of Federal law. So all the Supreme Court was saying in Lane is you do a harmless error analysis, and one aspect of a harmless error analysis, of course, is that the evidence is overwhelming, which it was in this case. All the blood in the truck, all the witnesses who saw him with cuts on his hands and face, he used the victim's property, he was clearly in her house, he called from her house on Wednesday night and Thursday morning, his fingerprints were found in the house. There's no doubt that he was in the house and that he was associated with blood. One question I did want to address, a factual question, it was on the blood on the blinds in his house. Laird broke into his own house to get some of his stuff and there was some blood found on the blinds. What happened was at the juvenile transfer hearing, the officer said, well, that was the victim's blood, Wanda Starnes' blood. What Randy Leister said, he said, well, I can't say conclusively that it was her blood, but it actually came out at trial, the testimony was by Leister was that it was consistent with Wanda Starnes' blood and it was not Laird's blood. He could say it was not Laird's blood, so he said it was similar to Wanda Starnes' blood and that's what our attorney said on page three of the answering brief to the U.S. Supreme Court, so that was not an error. The U.S. Supreme Court did say, as part of its analysis, that that was a match, which maybe was overstating the evidence slightly, but the important point was that it was not Laird's blood, it was someone else's blood, consistent with Wanda Starnes' blood. If the Court has no more questions, I believe I'll sit down. You may do so. We don't seem to. We have a little bit of rebuttal time remaining. Judge Talman, you had asked me whether or not in the limiting instruction, whether or not a limiting instruction was ever given, and I rechecked, and, no, the instructions given to the jury in Laird's capital trial contained no such limiting instruction to consider the charges separately. Well, the portion I quoted you did not look to me like it was a specific limiting instruction. It looked to me like a general instruction to the jury. Are you still saying that was from the wrong case? I am, yes. Okay. Mr. Laird went back in the summer of 2005 to be resentenced on the capital claim. And the interesting thing that occurred there was that it was the same trial judge resentencing him. The same trial judge was actually also the judge that sat on his State post-conviction proceedings. And all throughout that, whenever they talk about prejudice with regard to the mitigation evidence, the Court would say, everything's already been presented. You haven't presented anything new. Where's your prejudice? And for the first time at Mr. Laird's resentencing on the capital claim, the Court actually reversed itself in the sentencing transcripts and said almost none of the mitigation evidence was presented to him when he was sentenced back in the 1990s. In Federal district court, we did marshal together and collect all of the mitigation evidence. And I think the reason why I'm telling that story is to point out to the Court that the prejudice argument is a very circular argument, and it's hard to make until there's actually been a chance for adequate factual development at an evidentiary hearing. But the prejudice he was talking about is prejudice as to the sentence versus prejudice as to guilt. That's the issue we must focus on, is it not? Yes, Your Honor, it is. And I was just analogizing because he was saying, you know, that the mitigation evidence that was finally developed was actually sufficient. But we would expect that evidence to be different, wouldn't we, on a question of punishment versus a question of liability for the crimes? Yes, but I think it's analogous in terms of a situation such as this where a trial counsel really did nothing to develop the guilt case at all. Counsel, your time has more than expired. Thank you very much. Thank you. The case just argued is submitted. And again, we thank counsel for very helpful arguments. We will take about a 10-minute break and then return for the remainder of the morning calendar.
judges: O'connor, Graber, Tallman